**Exhibit 1**



**LAUTERBACH, BORSCHOW & COMPANY**
A PROFESSIONAL CORPORATION
CERTIFIED PUBLIC ACCOUNTANTS
BUSINESS & PERSONAL CONSULTANTS

4130 RIO BRAVO DR., SUITE B
EL PASO, TEXAS 79902
(915) 544-6950
FAX (915) 544-1303

December 27, 2012

Mr. Christopher R. Johnston
Firth Johnston Martinez
415 N. Mesa Suite 300
El Paso, Texas 79901

Re: DHC Realty, LLC et al v. Armando Armendariz,
     Yvette Armendariz, & Hector Armendariz and
     the Expert Witness Report of Douglas A. Little

Dear Mr. Johnston:

We have read the expert witness report prepared by Douglas A. Little, CPA, CVA regarding DHC Realty, LLC et al v. Amando Armendariz, Yvette Armendariz and Hector Armendariz. In his report, Mr. Little makes several key assumptions which provide the foundation for his analysis and conclusions. In the following, we will analyze these key assumptions and why they may not present a sufficient foundation on which to base a conclusion.

We are not presenting any opinion on the underlying financial data that was used by Mr. Little in his analysis. We do not have access to any of the accounting records or financial reports of El Paso DHC Enterprises, LLC, El Paso DHC Enterprises Far East, LLC, or El Paso DHC Enterprises West, LLC and therefore cannot provide any analysis on the financial statement items presented.

SECTION V. BASIS FOR OPINION

In the opening sentence of this section Mr. Little makes the very important assumption that "the failure of the restaurants to achieve earnings consistent with industry and franchisor benchmarks was a direct result of the actions of Mr. Armando Armendariz, Yvette Armendariz, and Hector Armendariz". There are a variety of reasons for which an operating business, in this case a franchised restaurant chain, would fail to perform to industry and franchisor standards, a defalcation by management being one of them. However, failing to meet industry standards in and of itself is not evidence of a defalcation. An operating business may fail to meet the benchmarks of its industry due to reasons such as poor management decisions, unfavorable market factors, unfavorable macroeconomic trends, poor location, or a detrimental cost structure. These are just a few examples of a wide range of reasons for poor performance by a business, none of which involve any act of misappropriation of assets by management.

Response to the Expert Witness Report of Douglas A. Little
Page 2

*Loss from Conversion of Inventory for Personal Gain*

Mr. Little concludes that an overall food cost of 32.5%, when compared to gross sales, is appropriate when performing his "normalized" analysis on the annual profit and loss statements provided by the Plaintiffs. He arrives at this percentage using statistics provided by the Fuddrucker's Franchisor and information published by the National Restaurant Association and Deloitte & Touche, LLP. As stated in his report, these are average and median statistics which, by their very definition, mean that numerous restaurants within the sample will experience food costs at or above the published statistic. Therefore, a restaurant experiencing above average food costs when compared to the industry as a whole would not be out of the ordinary and certainly would not be evidence on it's own of any wrong doing on the part of management. These statistics that Mr. Little uses are national averages and do not take into account the local market influences that are specific to the El Paso metropolitan area. Perhaps a more valid comparison for these purposes would be the average food costs for limited services restaurants in El Paso County and southern New Mexico. Additionally, while Mr. Little does demonstrate that the three Fuddrucker's franchises owned by the Plaintiff's did not perform to the national averages, in terms of food costs, of the franchisor or industry as a whole, he does not make a valid link between underperformance and a misappropriation of inventory items by the Defendants. Were the Defendants ever witnessed removing inventory items from storage? What controls may or may not have been in place to prevent this? What actions were taken on the part of the Defendants to conceal their theft? What detailed records are there that would provide evidence of a conversion of inventory items? Was there theft of inventory items that was perpetrated by other individuals? These are all issues that should be addressed before one can arrive at the conclusion that the Defendants had misappropriated inventory.

*Misappropriation of Sales Proceeds and Discount Manipulation*

Mr. Little uses franchisor estimates and actual restaurant performance from April 2012 through September 2012 to conclude that an appropriate percentage for discounts when compared to net sales is 3.81%. We do not believe this is a sufficent basis to determine an appropiate discount percentage without additional analysis of the variety and types of discounts used by the restaurants. For example, the restaurants entered into a partnership with several local school districts which provided free and discounted meals to students and school district employees. Such a wide ranging promotion would be a major influence on discount percentages yet Mr. Little's report makes no mention of the program or if the discount percentage estimates provided by the franchisor typically include such a large scale promotional event. Similar to his analysis of food costs, Mr. Little provides no evidence that discount levels were driven by fraud on the part of the Defendants. How does the discount function on the point of sale system work? Did the Defendants have access to the point of sale system in order to perpetrate such a scheme? What types of detailed records would the Defendants have to manipulate to conceal the fraud? Were these types of records examined? Again, Mr. Little's report does not show evidence of a link between discount levels and a fraud allegedly perpetrated by the Defendants.

*Misdirected Payroll to a Related Party*

Mr. Little examined payroll records and applied a 9% payroll tax cost to determine that the total gross payroll costs of employing Daniel Armendariz was $8,188.63 in 2011 and $10,362.25 in 2012. These amounts were then subtracted out of labor costs on his normalized profit and loss exhibits. The implicit

assumption is made that Mr. Armendariz was paid but never performed any type of service for any of the restaurants owned by the Plaintiffs. There is no evidence cited in the report that this was the case. If Mr. Armendariz did, in fact, perform services for the restaurants during the time period of his employment then what evidence is there that he was over compensated in relation to the services he performed? What type of services did he perform? What would have been considered reasonable compensation for those services? Were time cards or other associated records examined to determine the type and amount of services performed by Mr. Armendariz? Mr. Little's report does not address these matters and considers the full cost of Mr. Armendariz's employment a defalcation on the part of the Defendants.

*Misappropriation of Vending Revenues*

Mr. Little's report does not provide evidence that the decline in vending revenues is a result of misappropriation on the part of the Defendants. Mr. Little averaged the percent of vending income as compared to sales for 2008 and 2009 and applied that average, 2.02%, to determine normalized vending income for 2010 through March 2012. This average is somewhat skewed due to the small number of data points in the sample (only two years) with 2009 having a much higher percentage of vending income (2.19%) than 2008 (1.88%). As a result, the normalized percentage used by Mr. Little represents a higher vending revenue percentage for all years in the presented range but one - 2009.

*Loss of Catering Revenue*

Mr. Little does not attempt to estimate an amount for lost catering revenue in his report though he does state that there is evidence of a decline in catering revenue once the Defendants were terminated. He does not speculate on potential reasons for a decline in catering revenue other than to state the Plaintiff's allegation that the Defendant's used proprietary customer information to contact catering customers. Perhaps the decline in catering revenue is due to the fact that the Defendants excelled at producing catering revenue for the restaurants, a skill which ownership has not been able to duplicate. What was the basis of comparison made by Mr. Little to determine that catering revenues had dropped? Was this adjusted for any seasonality in catering sales? How many months were analyzed by Mr. Little after the Defendants were terminated that brought him to this conclusion?

## CONCLUSION

Mr. Little's report relies on several assumptions, the principal assumption being that the "damages to the Plaintiffs" resulted "from the allegations in the complaint". Variances from industry and franchisor averages are assumed to be a result of the allegations made by the Plaintiffs and the conclusions made by Mr. Little are based upon the allegations of the plaintiffs and not upon evidence of any defalcation by the Defendants.

Response to the Expert Witness Report of Douglas A. Little
Page 4

Respectfully yours,

LAUTERBACH, BORSCHOW & COMPANY, P.C.

by _____/s/_____
      Matt C. Kerr, CPA